IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

ROBERT H. CROW                                          PLAINTIFF

v.                          Civil No. 08-3057

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                          DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Melvin Phillips, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.    Procedural Background

The plaintiff filed his applications for DIB and SSI on October 14, 2004, alleging an onset date of December 31, 1999, due to gout, neck and shoulder pain, and mental impairments. (Tr. 51, 52, 73-74, 91, 126). His applications were initially denied and that denial was upheld upon reconsideration. (Tr. 29, 34, 35, 37). Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ). An administrative hearing was held on March 14, 2007. (Tr. 185-222). Plaintiff was present and represented by counsel. At the hearing, plaintiff requested that his claim be amended to request a closed period of disability from December 31, 1999, until

April 1, 2006, because plaintiff had returned to work in April 2006 and worked for 8 months. (Tr. 193-194).

At this time, plaintiff was 53 years of age and possessed a high school education. (Tr. 192, 195). He had past relevant work ("PRW") experience as a welder, sales manager, and foreman at a foundry. (Tr. 57-64, 209-211).

On February 29, 2008, the ALJ found that plaintiff's generalized osteoarthritis, impingement syndrome of the left shoulder, and mood disorder were severe but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 13-16). After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; push/pull 10 pounds frequently; frequently reach overhead, climb stairs/ramps, balance, stoop, crouch, and kneel; sit, stand, and/or walk for 6 hours during an 8-hour workday; and, occasionally crawl and climb ladders/scaffolds. (Tr. 16). From a mental standpoint, the ALJ also determined that plaintiff was mildly limited in his ability to understand, remember, and carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with the public, co-workers, and supervisors; and, respond appropriately to routine work changes. Plaintiff was also moderately limited in his ability to respond appropriately to usual work stresses. (Tr. 16-18). With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a production assembler, cashier II, and sales attendant/self service store attendant. (Tr. 19).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on August 14, 2008. (Tr. 2-4). Subsequently, plaintiff filed this action. (Doc. # 1). This

AO72A
(Rev. 8/82)

case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 7, 8).

## II.    Applicable Law

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3),

3

1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

### A.      The Evaluation Process:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## III.    Evidence Presented

### A.      Gout and Chronic Pain

On April 18, 2002, Dr. Thomas Knox evaluated plaintiff for neck and left shoulder pain. (Tr. 126). Plaintiff indicated that he had been involved in an altercation a couple of years prior, at which time the pain in his neck began. He also complained of paresthesias and numbness in his right hand and pain in his left shoulder. Left shoulder elevation was 145 to 150 with external rotation to 50 degrees. His scapular plane strength was fair with tenderness appreciated in the scapular plane. Cervical spine motion was slightly limited and decreased sensation was noted in the small and ring fingers. X-rays of his shoulder revealed a Type II acromion. The

4

glenohumeral joint was normal, but the cervical spine showed severe degenerative changes in the lower elements. Dr. Knox diagnosed plaintiff with C7 dermatome problems likely secondary to his arthritic change and impingement syndrome in his left shoulder. He discussed a cortisone injection with plaintiff and referred him to a neurosurgeon for an evaluation. (Tr. 126).

On December 2, 2003, plaintiff reported pain bilaterally in his feet radiating into his ankles. (Tr. 128). He indicated that nine months prior his other leg had swollen up the same way. Plaintiff stated that this had occurred off and on over the past few years. It reportedly hurt for the bed sheets to touch his feet and elevation helped decrease the pain. An examination revealed decreased pulses in his left lower extremity. Edema and erythema were noted in his right foot. Laboratory studies revealed an elevated uric acid level, consistent with gout. Dr. Richard Ahrens diagnosed plaintiff with right foot erythema and pain markedly over his first metatarsal joint, assumed to be gout. He prescribed Colchicine and Percocet. (Tr. 128).

On March 4, 2004, plaintiff called Dr. Ahrens' office and stated that his gout was recurrent and the gastrointestinal side effects of the Colchicine were unbearable. Accordingly, Dr. Ahrens prescribed Allopurinol. (Tr. 128).

On July 28, 2004, plaintiff requested pain medication and a diet to help treat his grout. (Tr. 127). He complained of pain and swelling in both hands and feet. An examination revealed tenderness and swelling in the right first metatarsal joint space. Dr. Ahrens increased his dosage of Allopurinol and Percocet. He was also given samples of Celebrex. (Tr. 127).

On February 23, 2005, plaintiff underwent a general physical examination. (Tr. 131-137). Plaintiff stated that he was applying for disability due to gout, which affected his ankles, feet, wrists, elbows, and shoulders. He indicated that Dr. Tammy Tucker had diagnosed him

5

with gout about five years prior. Plaintiff was given Allopurinol to take daily and it helped. He was also taking Indocin. Plaintiff told the doctor that as long as he took his medication, he felt better and would experienced one gout attack every two to three months. He tried to get a job but found it difficult to find one due to his age. Plaintiff indicated that he could take care of himself, cook, keep the house, and buy groceries. He also admitted to smoking a package of cigarettes per day and drinking a six pack of beer daily. A physical examination was within normal limits, revealing no range of motion limitations, muscle spasm, muscle atrophy, or gait/coordination issues. He could hold a pen and write, touch fingertips to palm, grip 100%, oppose thumb to fingers, pick up a coin, stand and walk without assistive devices, walk on heel and toes, and squat and arise from a squatting position. X-rays of his feet and ankles were both normal. The doctor diagnosed plaintiff with a history of gout and noted that he became short of breath easily. He stated that plaintiff should probably cut down on his intake of beer and stop smoking. As for limitations, the doctor stated that plaintiff could walk, stand, sit, lift, carry, handle, finger, see, hear, and speak. (Tr. 131-137).

## B. Mental Impairment(s)

Hospital records dated between 1990 and 1991, indicate that plaintiff was hospitalized on at least four occasions with the diagnosis code V71.09. (Tr. 171-174). This diagnosis code means that plaintiff was admitted for observation of other suspected mental condition. However, no treatment records are attached to indicate the particular treatment plaintiff received. (Tr. 171-174).

On June 24, 2005, plaintiff underwent a neuropsychological evaluation with Dr. Vann Smith. (Tr. 138-146). Plaintiff reported poor general health with a history of gout; osteoarthritis

6

of the back, neck, and shoulder; degenerative disk disease; and, "lots" of closed head injuries with resulting concussions. He complained of chronic, often immobilizing neck, shoulder and mid-back pain which he rated anywhere from a one to a nine on a ten-point scale. He had no history of psychiatric attention. At the time of the evaluation, plaintiff's affect was muted, shallow, and rigid and his mood mildly dysthymic. His narratives were marginally fluent but logical and informative without evidence of associational anomaly. Occasional audiblized word finding pauses were noted. Plaintiff's memory was moderately impaired, his gait slow and hesitant with restricted associated arm movement, his posture rigid and guarded, his eye contact appropriate, and his thought processes functional to concrete in quality. He voiced no suicidal or homicidal ideation, intent, plan, or impulse and denied hallucinations and/or delusions. (Tr. 138-146).

IQ testing revealed a full scale IQ of 95. (Tr. 138-146). Dr. Smith concluded that testing coupled with a mental status examination revealed a pattern of abnormal findings consistent with the presence of impaired brain function. He diagnosed plaintiff with cognitive dysfunction and moderate, steadily worsening neurocognitive function. He then assessed plaintiff with a global assessment of functioning of 55-60. (Tr. 138-146).

Dr. Smith also completed a mental RFC assessment. (Tr. 142-146). He indicated that plaintiff's prognosis was fair/guarded. Dr. Smith concluded that plaintiff would be unable to meet competitive standards with regard to maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms; understanding and

7

remembering detailed instructions; carrying out detailed instructions, setting realistic goals or making plans independently of others; and, dealing with the stress of semiskilled and skilled work. He also determined that plaintiff would be seriously limited but not precluded with regard to working in coordination with or proximity to others without being unduly distracted, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places, and using public transportation. Dr. Smith stated that chronic orthopedic/inflammatory pain was a major factor in plaintiff's case. He believed that plaintiff's psychiatric condition would exacerbate his experience of pain and other physical symptoms. Further, Dr. Smith stated that plaintiff's impairments would result in him missing more than four days of work per month. However, he also indicated that the abuse of alcohol contributed to plaintiff's symptoms. (Tr. 142-146).

On March 3, 2005, Dr. Ronald Crow, a non-examining, consultative doctor completed a physical RFC assessment. (Tr. 147-148). After reviewing plaintiff's medical records, he concluded that plaintiff had a non-severe physical impairment. (Tr. 147-148).

On July 18, 2006, plaintiff underwent a psychological evaluation with Dr. Robert Hudson. (Tr. 149-158). Dr. Hudson noted that plaintiff often removed and/or loosened his shoes during the interview to relieve his foot pain. Plaintiff complained of a variety of arthritic type problems, his biggest problem being gout. He reported severe joint pain at times and difficulty staying on his feet. However, at the time of the interview, plaintiff was working at Ranger-Boats as a foam cutter. Plaintiff stated that his employer was good to work for, allowing him to rest

8

as needed. He did not view himself as having mental health problems other than mild depression. Working and having some income had helped his depression, but he was not certain he could hold up to the demand. Plaintiff's only reported medications were over-the-counter pain and inflammation medications including Advil and Aleve, reportedly due to his inability to afford prescription medications. (Tr. 149-159).

Dr. Hudson noted plaintiff's personal and family history of alcohol abuse. (Tr. 149-158). His father and brother both committed suicide, his mother died at age 60 due to complications from alcoholism, and he referred to his living brother as "radioactive." Plaintiff stated that he had consumed a 12 pack daily for about 20 years. Plaintiff had lost his driver's license and spent nine months in the county jail. As a result, he was required to participate in treatment and attend some AA classes. Otherwise, he had not found it necessary to participate in treatment. Plaintiff stated that he continued to drink, but was now only a weekend drinker and tried not to overdo it. (Tr. 149-158).

Plaintiff smiled and laughed appropriately, had good rapport, was alert, and worked diligently. He was spontaneous, but a bit scattered and not viewed as a good historian for the details of his life. (Tr. 149-158). Dr. Hudson noted that plaintiff probably would not mention something unless directly asked about it, but he did not appear to be circumstantial at all. His thinking was generally logical and goal directed and he was able to process language well both verbally and in written form. There was no clear indication of thought disorder, but plaintiff did relate his belief that his thoughts influenced the future. If his thoughts had a bad outcome, he believed the probability of them occurring increased the more he thought the thoughts. Plaintiff's affect was somewhat blunted and his mood was congruent. There was little doubt that

his affect/mood had improved since he had gone back to work, due to the income and increased social contact. Although he had not been in over a year, plaintiff reported an interest in fishing. He also stated that he had recently "broke down" and bought a fishing license. Plaintiff reported getting along well with others and it was clear to Dr. Hudson that plaintiff enjoyed the social side of working. He also enjoyed shopping. (Tr. 149-158).

Dr. Hudson noted plaintiff's history of concussion and prolonged abuse of alcohol. (Tr. 149-158). He also acknowledged Dr. Smith's conclusion that plaintiff evinced brain damage and was disabled. Dr. Hudson was of the opinion that plaintiff did have much cognitive residual, but did some intellectual tasks exceptionally well. He was also able to care for his personal needs, cooperate with medical advice as he could afford to get it, and denied dangerous behaviors. Plaintiff stated that he performed chores, but what he could do depended on the day. There were times when his gout severely limited what he could do. Plaintiff relayed that he did have friends who kept an eye on him. Dr. Hudson found plaintiff's concentration, persistence, and pace to be mixed but generally within normal limits. Plaintiff was literate and able to function cognitively at an acceptable level, although he may have some specific deficits. His full scale IQ was 103. Dr. Hudson found plaintiff to be very people oriented, but he did not socialize a lot outside of work thereby making work very important to him. Dr. Hudson indicated that plaintiff could be expected to work as much as possible. Plaintiff asked Dr. Hudson for a note so he could be excused from work, but by the end of the session, he was thinking he would be able to manage the shift. Dr. Hudson diagnosed plaintiff with cognitive dysfunction (mild-to-moderate) secondary to gout, degenerative disk disease, arthritis, multiple traumatic brain injuries, and/or alcohol abuse which could be continuing more sporadically and at a lesser rate than in the past.

10

Testing revealed that plaintiff was no more than mildly depressed and mildly to moderately anxious and non-psychotic. Should plaintiff not be able to continue working, Dr. Hudson expected an increase in both anxiety and depression, even with a favorable ruling in his disability case. On a mental RFC assessment, Dr. Hudson found plaintiff to have moderate limitations with regard to responding appropriately to work pressures in an usual work setting and only slight limitations regarding understanding, remembering, and carrying out simple instructions; understanding, remembering, and carrying out detailed instructions; making judgments on simple work-related decisions; interacting appropriately with the public; interacting appropriately with supervisors; and, responding appropriately to change in a routine work setting. (Tr. 156-158).

## IV.  Discussion

Plaintiff contends that the ALJ's decision denying benefits is not supported by substantial evidence because the ALJ failed to properly consider plaintiff's subjective complaints; failed to find plaintiff's gout and cognitive dysfunction to be severe impairments, concluded that plaintiff could perform a limited range of light work, failed to make full and explicit findings explaining his disregard of the medical records, and determined that plaintiff could still perform work that exists in significant numbers in the national economy.

### A.  Subjective Complaints

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing her reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th

11

Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents her from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

Plaintiff testified to experiencing chronic pain due to arthritis, bursitis, gout, and anxiety. (Tr. 196). He stated that he had arthritis and bursitis in his shoulders, back, elbows, knees, and ankles, which resulted in continuous pain. (Tr. 200-201). Plaintiff also suffered from gout in his feet, causing his feet feel like they were on fire and like he was walking on cactus. (Tr. 197, 201). Further, plaintiff reported that his joints would swell up, particularly his feet and toes. He credited Neurontin with improvement of his condition such that he could return to work in April

AO72A
(Rev. 8/82)

2006. (Tr. 198). As for anxiety, plaintiff stated that he experienced weekly anxiety attacks causing him to become sick to his stomach, worry, and not know what to do. (Tr. 205, 207-208). He also reported problems with his memory, requiring him to write everything down. (Tr. 206).

During the relevant time period, plaintiff was treated for gout on only three occasions. There are no further records to indicate that plaintiff sought treatment for his gout, in spite of the level of pain and impairment his subjective complaints suggest. *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). The undersigned finds it very difficult to believe that an individual in the degree of pain plaintiff reported experiencing would not seek medical assistance either through a local clinic or an emergency room. We also note that the treatment he did receive for gout was conservative, consisting only of medication. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). Dr. Ahrens prescribed Allopurinol, Celebrex, and Percocet.

A general physical examination revealed no abnormalities. Plaintiff had no range of motion limitations, muscle spasm, muscle atrophy, or gait/coordination issues. He could hold a pen and write, touch fingertips to palm, grip 100%, oppose thumb to fingers, pick up a coin, stand and walk without assistive devices, walk on heel and toes, and squat and arise from a squatting position. X-rays of his feet and ankles were also normal. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

Further, aside from the mental evaluations ordered by the Agency and scheduled by plaintiff's attorney, there is also no evidence to indicate that plaintiff sought treatment for his alleged mental impairments. *See Moad v. Massanari*, 260 F.3d 887, 892 (8th Cir. 2001) (in assessing credibility, the court noted that plaintiff had not sought treatment from any physician in the seven months prior to administrative hearing).

Plaintiff's reported activities also contradict his claim of disability. Plaintiff testified that he spent his time watching television and reading the newspaper. (Tr. 202). He stated that he did not get out much, but his friends Didrea and Gary came over regularly to help him out. (Tr. 207). On an adult function report, plaintiff indicated that a typical day for him involved making coffee, taking his medication, feeding his cats and birds, watching television, reading the newspaper, calling friends, preparing dinner, washing dishes, taking a shower, cleaning the house up "a bit," and going to bed. (Tr. 65). He reported no difficulty caring for his personal hygiene, preparing bargain brand fix at home meals, washing dishes, doing the laundry, cleaning the house, shopping in stores for food, walking (when his gout is not fared up), paying bills, counting change, using a checkbook/money orders, doing cross word puzzles, watching television, watching birds in feeders, and carving wood. (Tr. 67-69). Plaintiff also reported the ability to eat dinner and watch NASCAR races with his friends once a week. (Tr. 69). He also indicated that he handled stress well and handled changes in routine pretty well. (Tr. 71).

On paperwork the plaintiff completed for his attorney, he stated that he cooked, washed dishes, made the bed, and groomed himself daily; drove, cleaned the house, and did the laundry weekly; performed yard work, fixed things, grocery shopped, payed bills, visited friends, talked to neighbors, and exercised monthly. (Tr. 105). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir.

1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). We also note that plaintiff told Dr. Abraham that he had been looking for work, but found it difficult to get a job due to his age. Plaintiff's admission that he sought employment is also inconsistent with his claim of disability. *Dunahoo v. Apfel*, 241 F.3d 1033, 1038- 1039 (8th Cir. 2001); *Melton v. Apfel*, 181 F.3d 939, 942 (8th Cir. 1999).

Further, in July 2006, plaintiff's only reported medications were over-the-counter pain and inflammation medications including Advil and Aleve. (Tr. 149-158). 20 C.F.R. § 404.1529(3)(iv); *see Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999) (holding that use of nonprescription medication is a relevant consideration when evaluating subjective complaints).

Plaintiff's friend, Didrea Miller, also testified on his behalf. (Tr. 212-217). Testimony indicates that Ms. Miller had known the plaintiff for five years. She indicated that when plaintiff came home from working at Ranger Boats, his feet were swollen. She stated that he could not walk on his feet at times, so he had chairs lined up in his trailer and would walk on his knees from chair to chair to get around the house. Ms. Miller also testified that plaintiff suffered depression, especially when his gout was bad and others would have to come and care for him. She said that he kept to himself and was very withdrawn, unlike the outgoing and very happy go

15

lucky guy he was when she first met him. Ms. Miller stated that plaintiff had experienced 20 to 30 gout flare ups in the last 5 years and that each flare up lasted a couple of weeks up to two months. (Tr. 214-215). The ALJ properly considered Ms. Miller's testimony, but found it to be unpersuasive, as it is not supported by the overall record. This determination was well within the ALJ's province. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Therefore, we find that the ALJ properly determined that plaintiff's daily activities were inconsistent with his subjective complaints of disabling impairment. His subjective complaints were also inconsistent with the medical evidence.

### B.    Non-Severe Impairments

Plaintiff asserts that the ALJ erred by failing to find his gout and cognitive dysfunction to be severe impairments. An impairment is not severe if it amounts only to a slight abnormality that would have no more than a minimal effect on the claimant's physical or mental ability to do basic work activities. *See Bowen v. Yuckert,* 482 U.S. 137, 153, 158 (1987); 107 S.Ct. 2287 (O'Connor, J., concurring); *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007); 20 C.F.R. § 404.1521(a). Basic work activities are defined as the abilities and aptitudes necessary to do most jobs ...." 20 C.F.R. § 404.1521(b). These include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; use of judgment; understanding, carrying out, and remembering simple instructions; responding appropriately to supervision and co-workers; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). It is the claimant's burden to establish that his impairment or combination of impairments are severe. *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000).

16

After reviewing the ALJ's opinion, it seems clear to the undersigned that the ALJ did consider plaintiff's gout to be a severe impairment. Although not listed in the caption to finding number 3 with osteoarthritis, impingement syndrome, and mood disorder, the ALJ discussed plaintiff's gout at length throughout the opinion. He also analyzed it throughout his opinion in conjunction with plaintiff's other severe impairments. Therefore, we find the ALJ's failure to specifically list gout in finding number 3 to be nothing more than a deficiency in opinion writing that has not prejudiced the plaintiff. *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 2000).

Plaintiff also contends that the ALJ erred in failing to find his cognitive dysfunction disorder to be severe. The record does indicate that plaintiff suffered multiple injuries to the head that resulted in concussions and loss of consciousness. At age 16, plaintiff stated that he had a motorcycle wreck and ended up in the hospital. (Tr. 203). Plaintiff reportedly loss consciousness and suffered a broken leg and ribs. At age 28, plaintiff was hit in the face and knocked unconscious. (Tr. 204-205). At age 35, plaintiff stated that he climbed a tree and the limb broke, causing him to fall 30 feet. (Tr. 203-204). This resulted in a loss of consciousness and a compression fracture. He also stated that he had fallen off his porch recently and busted his head "pretty good." (Tr. 205). Plaintiff indicated that the fall dazed him and he had to lie on the ground for 20 minutes before he could get up. However, in spite of these head injuries, we note that plaintiff was able to graduate from high school and work for a number of years before allegedly becoming disabled by his gout. Plaintiff does not contend that his cognitive dysfunction is what caused him to stop working.

While we note Dr. Van Smith's assessment finding plaintiff to be disabled due to cognitive dysfunction, we also note Dr. Smith's acknowledgment that the abuse of alcohol

AO72A
(Rev. 8/82)

contributed to plaintiff's symptoms.  There is, however, no indication as to whether plaintiff would remain disabled if alcohol was not a factor.[1]  Further, Dr. Smith appears to have accepted plaintiff's subjective complaints and utilized them in his assessment.  As such, we do not find that Dr. Smith's opinion was entitled to significant weight.  *See Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008) (treating physician's opinion does not deserve controlling weight when it is merely conclusory statement and not supported by medically acceptable diagnostic techniques).

Dr. Hudson, who also evaluated plaintiff, recognized Dr. Smith's assessment.  He concluded that, although plaintiff did have some cognitive residual, he was able to function cognitively at an acceptable level.  In his opinion, plaintiff was literate and performed some intellectual tasks exceptionally well, with an average  full scale IQ of 103.  Plaintiff's concentration, persistence, and pace were also within normal limits.  And, plaintiff was able to perform a variety activities evidencing that his cognitive functioning was not significantly impaired.  Further, he was able to return to work in 2006 stating that the only accommodation made for him was the ability to take breaks as needed.  Therefore, it seems clear to the undersigned that plaintiff's cognitive dysfunction is a non-severe impairment that would have no more than a minimal effect on his ability to work.  As such, we cannot say that plaintiff's cognitive impairment was severe.

---

[1]We also note that Dr. Vann Smith has performed neuropsychological evaluations in a number of disability cases that have become before this court, and he has consistently found the plaintiffs to be disabled due to cognitive dysfunction or organic brain syndrome.  This court can not recite a single case in which Dr. Smith concluded the plaintiff was not disabled.

AO72A
(Rev. 8/82)

However, regardless of the severity of plaintiff's cognitive impairment, the mental RFC proposed by Dr. Hudson is the RFC adopted by the ALJ. Therefore, it is clear that plaintiff's cognitive impairment was taken into consideration in conjunction with plaintiff's depression and anxiety.

## C.     The ALJ's RFC Assessment

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ considered plaintiff's gout, osteoarthritis, impingement syndrome, mood disorder, and cognitive dysfunction when assessing plaintiff's RFC. He also discussed and considered all of the medical records submitted to him. While it is clear to the undersigned that

plaintiff suffered some pain and discomfort from his impairments, it is not clear that plaintiff was disabled by those impairments. Although plaintiff reported suffering from frequent flare-ups of gout, these allegations are not supported by the medical evidence . As previously mentioned, plaintiff sought treatment for his gout on only three occasions during the relevant time period. Each time, he was treated conservatively with medication. Had plaintiff's flare-ups been as painful and debilitating as alleged, we believe he would have sought additional medical treatment for his condition.

Plaintiff seeks to excuse his failure to seek consistent treatment for financial reasons, stating that he did not have the resources to obtain treatment. However, there is no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking one package of cigarettes a day and drinking alcohol to help finance his treatment. *See Nelson v. Sullivan*, 966 F.2d 363, 367 (8th Cir. 1992) (the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain). *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999). Accordingly, we do not find that plaintiff's failure to seek treatment is excused by his financial situation. *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan,* 892 F.2d 747, 750 n. 2 (8th Cir. 1989) (noting that "lack of means to pay for medical services does not *ipso facto* preclude the Secretary from considering the failure to seek medical attention in credibility determinations.") (internal quotations omitted).

We note that Dr. Abraham as well as Dr. Crow concluded that plaintiff's physical impairment was non-severe. Dr. Abraham specifically found that plaintiff could walk, stand, sit,

20

lift, carry, handle, finger, see, hear, and speak. Giving plaintiff the benefit of the doubt, the ALJ concluded that plaintiff did have a severe impairment that affected his ability to perform exertional work activities. We find substantial evidence to support the ALJ's conclusion that plaintiff could lift 20 pounds occasionally and 10 pounds frequently; push/pull 10 pounds frequently; frequently reach overhead, climb stairs/ramps, balance, stoop, crouch, and kneel; sit, stand, and/or walk for 6 hours during an 8-hour workday; and, occasionally crawl and climb ladders/scaffolds. (Tr. 16).

Again, plaintiff contends the ALJ erred by failing to include Dr. Smith's assessment in his RFC. However, as previously discussed, Dr. Smith's opinion was not entitled to significant weight. We note Dr. Hudson's assessment that plaintiff could function cognitively at an adequate level and that he suffered from only mild depression and moderate anxiety. Dr. Hudson concluded that plaintiff was very people oriented. Plaintiff reported getting along well with others and it was clear to Dr. Hudson that he enjoyed the social side of working. He also enjoyed shopping. Dr. Hudson even indicated that plaintiff would likely see an increase in symptoms if unemployed.

On a mental RFC assessment, Dr. Hudson found plaintiff to have moderate limitations with regard to responding appropriately to work pressures in an usual work setting and only slight limitations regarding understanding, remembering, and carrying out simple instructions; understanding, remembering, and carrying out detailed instructions; making judgments on simple work-related decisions; interacting appropriately with the public; interacting appropriately with supervisors; and, responding appropriately to change in a routine work setting. (Tr. 156-158). Plaintiff even indicated that he handled stress well and handled changes in routine pretty well.

AO72A
(Rev. 8/82)

(Tr. 71).  Plaintiff reported that he was semi-good at following written and oral instructions.

Further, he had two friends who stopped by his house regularly to help him out with chores.  On

paperwork, he also reported the ability to eat dinner and watch NASCAR races with his friends

once a week.  (Tr. 69).  Therefore, it seems clear to the undersigned that the ALJ's mental RFC

is supported by substantial evidence in the record as a whole.

### D.      Vocational Expert's Testimony

Testimony from a vocational expert based on a properly-phrased hypothetical question

constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf.*

*Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not

encompass all relevant impairments, VE's testimony does not constitute substantial evidence to

support the ALJ's decision).  The ALJ's hypothetical question needs to "include only those

impairments that the ALJ finds are substantially supported by the record as a whole."  *Id.* (citing

*Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228,

1230 (8th Cir.1994).

In the present case, the ALJ asked the vocational expert whether a person of plaintiff's

age, education, and past experience, who could perform light work with frequent reaching

overhead, climbing stairs and ramps, balancing, stooping, crouching, and kneeling and

occasional climbing ladders and scaffolds and crawling.  (Tr. 121–124).  He also indicated that

said person had mild limitations in the ability to understand, remember, and carry out complex

instructions; make judgments on complex work-related decisions; interact appropriately with the

public, co-workers, and supervisors; and, respond appropriately to routine work changes.

Further, said person was moderately limited in the ability to respond appropriately to usual work

stresses. (Tr. 121). The expert indicated that such a person could perform work as a production assembler, cashier II, and sales attendant/ self service store attendant. (Tr. 122). Clearly, the hypothetical posed to the expert encompasses all of the impairments that the ALJ found were substantially supported by the record as a whole.

Although Dr. Smith opined that plaintiff would likely miss four days of work per month due to his symptoms, it is not clear to the undersigned that plaintiff's symptoms were that severe. Plaintiff returned to full-time work in 2006 and there is no indication that he missed four days of work per month. In fact, there is some contradiction in the record as to why plaintiff stopped working eight months later. Plaintiff testified that he voluntarily took time off from work due to his symptoms and simply failed to return. (Tr. 209). However, the evidence also indicates that plaintiff's brother underwent surgery around this same time. As such, it is not clear that plaintiff stopped working after eight months due to his alleged impairments. Therefore, we find the vocational expert's testimony to constitute substantial evidence.

**V.      Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this <u>16th</u> day of February 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)